UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CLARA PINKSTON,

                     Plaintiff,

v.                                     Case Number 09-10513-BC
                                     Honorable Thomas L. Ludington

ACCRETIVE HEALTH,

                     Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION TO SUPPLEMENT RESPONSE, DENYING AS
MOOT DEFENDANT'S MOTION IN LIMINE, AND DISMISSING COMPLAINT WITH
PREJUDICE**

Plaintiff Clara Pinkston's complaint alleges claims of race and age discrimination under the

Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq., against

her former employer, Defendant Accretive Health. Now before the Court is Defendant's motion for

summary judgment [Dkt. # 15], filed October 30, 2009. Pursuant to the grant of extensions of time,

Plaintiff filed a response [Dkt. # 20] on December 4, 2009, and Defendant filed a reply [Dkt. # 49]

on December 22, 2009. The Court has reviewed the parties' submissions and finds that the facts and

the law have been sufficiently set forth in the motion papers. The Court concludes that oral

argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the

motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

As will be further explained below, Defendant's motion for summary judgment will be

granted because Plaintiff cannot establish the fourth element of a prima facie case or a pretext for

race or age discrimination under the burden shifting analysis of *McDonnell Douglas*. Also before

the Court is Plaintiff's motion [Dkt. # 23] to supplement her response, which will be denied for the

reasons stated below, and Defendant's motion in limine challenging Plaintiff's expert [Dkt. # 14], which will be denied as moot.

I

Plaintiff, an African-American woman, began employment at St. Mary's Hospital of Michigan ("St. Mary's") in 1969.  When her employment was terminated on or about November 5, 2007, she was fifty-nine years old.  Plaintiff testified that for the first eight years of her employment, she was a ward clerk, or unit secretary.  After that, she moved to positions in the patient accounting department – for four years she was responsible for outpatient billing, then for ten years she was responsible for inpatient billing.  Subsequently, Plaintiff moved to a credit and collections position for ten to fifteen years.  Later, Plaintiff performed customer service duties, and in the final years of her employment, her duties varied from credit collections, billing, and customer service, all within the patient accounting department.  Pl. Tr. 11-24, Sept. 4, 2009 (Def. Br. Ex. A).

In 2004, St. Mary's entered a contractual relationship with Defendant for Defendant to manage the day to day activities of St. Mary's employees in the revenue cycle.  Defendant's Senior Vice President for Operations Stephen Smith testified that St. Mary's, and not Defendant, maintained the authority to discharge employees.  Smith Tr. 7, Sept. 15, 2009 (Def. Br. Ex. B).  Beginning in 2006, and through the time that Plaintiff's employment was terminated, Rhonda Miller, an employee of Defendant who reported to VP Smith, was the Director of Revenue Cycle and Site Lead at St. Mary's.

Plaintiff testified that when Defendant began to manage St. Mary's employees in 2004, employees were discharged, work duties were combined, and positions remained unfilled.  Pl. Tr. 38-39.  When Defendant took over management, Plaintiff was a credit collector in the patient

-2-

accounting department. Pl. Tr. 18-19. From that time until her discharge, Plaintiff worked in credit and collections, billing, and customer service within the patient accounting department. Pl. Tr. 20-23. Immediately prior to her discharge, Plaintiff worked in customer service and her duties included answering patient calls, explaining bills, and providing information such as itemized statements. Pl. Tr. 20, 23-24. Plaintiff worked out of an office relatively far from the main hospital until March 2007, at which point she moved to a building across the street from the main hospital. Pl. Tr. 39-40.

VP Smith testified that he and executive level management made a decision in spring 2007 to move the patient accounting office of St. Mary's to Detroit, and that twenty-five employees were affected by the decision. Smith Tr. 6-7, 12. Smith testified that he recommended eliminating the patient accounting positions, Smith Tr. 7, but St. Mary's directed that there should be no job loss and for Defendant to "try to find them things to do . . . and try to find them other jobs if possible." Smith Tr. 12. Similarly, Director Miller testified that the decision to close down patient accounting was made by executives of St. Mary's and Defendant. Miller Tr. 9, July 28, 2009 (Def. Br. Ex. C). Miller testified that it was her understanding that the decision was made to centralize certain functions of St. Mary's so that it would become more cost effective. Miller Tr. 10-11.

Nonetheless, as positions were eliminated, Smith testified that he relied on Miller's "recommendation as to who would go and who would stay." Smith Tr. 10. Smith testified that the people initially selected to stay on were "[t]he people that were best suited, we thought, to the work that needed to be done." Smith Tr. 8-9. Smith testified that the criteria was "what their skill set was." Smith Tr. 8-9. Miller testified that the specific elimination of Plaintiff's position was not based on job performance, but based on the fact that the functions of patient accounting were being closed down. Miller Tr. 10.

Director Miller testified that the closing of patient accounting "was a very slow process the way that the hospital administration decided to close it in phases," but eventually, "everyone that was in patient accounting was affected." Miller Tr. 14-15. She further testified that "many employees resigned on their own and went to new positions as they found them, and then there were layoffs. . . ." Miller Tr. 15; *see also* Pl. Tr. 70-72 (confirming that some employees quit, transferred, or were fired). Plaintiff testified that she was told by Defendant, Director Miller in particular, that some of the patient accounting staff would be kept at the main hospital and that Plaintiff would not lose her job. Pl. Tr. 60, 68-74. Plaintiff testified that she did not apply for other open positions because she was "constantly being reassured that I would have a position." Pl. Tr. 81-82. VP Smith testified that by fall 2007, only five of the original twenty-five employees remained in patient accounting, and St. Mary's directed that the remaining positions be eliminated. Smith Tr. 12-13.

In September 2007, about two months prior to Plaintiff's discharge, three other employees, Louise Townsend, Gloria Bartnick, and "Jennifer," were discharged. Pl. Tr. 73. At that point, Plaintiff continued performing customer service duties, but was also assigned some of the former employees' duties, including the posting of checks and general ledger work. Pl. Tr. 42-43. Other duties of the former employees were outsourced. Pl. Tr. 43. Also around that time, after Director Miller informed Plaintiff and her work partner, Rosemary Martin, that one of them would have to move across the street to the main hospital to work, Plaintiff volunteered to move and began to perform her customer service work out of the financial counselor's office in the main hospital. Pl. Tr. 160-63. Plaintiff testified that she also performed some duties normally performed by financial counselors, such as helping patients with Medicaid applications. Pl. Tr. 48. Plaintiff testified that forty-percent of her work was customer service and sixty-percent primarily involved "[t]aking

payments, sending out itemized statements, faxing reports, keeping a log, doing refunds."  Pl. Tr. 51-52.

On or about November 5, 2007, Plaintiff was discharged, along with her work partner, Ms. Martin.  Pl. Tr. 86.  While VP Smith testified that Plaintiff was not replaced, Smith Tr. 8, Plaintiff contends that she was replaced by Lesley Robinson, a Caucasian St. Mary's employee approximately forty years old.  Pl. Tr. 103, 130.  An affidavit of St. Mary's Human Resources Director Paula Coffee states that Ms. Robinson held a position as a financial counselor from November 7, 2006, until she took a personal leave of absence in March 2008, and was discharged in March 2009 after her leave of absence expired.  Coffee Aff. Oct. 14, 2009 (Def. Br. Ex. F).  VP Smith and Director Miller testified that financial counselors are not part of patient accounting and hold separate positions from customer service positions.  Smith Tr. 14; Miller Tr. 11.

Plaintiff provided the following testimony to support her assertion that Ms. Robinson replaced her:

> Q: Okay.  You allege in your Complaint that Leslie Robinson replaced you, that she essentially took over your job.  What do you base that on?
>
> A: I went back two weeks after I was terminated because I had left my jacket in my office.  And she was standing there in the door.  I said what are you doing, Leslie?  She said, "I'm doing your job."
>
> Q: Is that the only basis you have for believing that Leslie Robinson is doing your job?
>
> A: Hearsay that she is still doing it.
>
> Q: Hearsay from who?
>
> A: Not her.  It was Sandy [Smith, a St. Mary's employee].
>
> A: Mm-hmm.  She was still doing it.

Pl. Tr. 107.  Plaintiff testified that Ms. Robinson "had to" have been performing general ledger and customer service work, based on the setup of the office.  Pl. Tr. 108-09.  Plaintiff testified that as

of September 2007, those types of duties were also performed by another financial counselor, Mary VanHove, and that some of the customer service and financial counselor job duties overlapped. Pl. Tr. 108-111. Plaintiff testified, primarily based on information told to her by Sandy Smith, that several financial counselors continued to perform patient accounting work in the office across the street from the main hospital. Pl. Tr. 78-80, 111-12.

Plaintiff testified that she had difficulty working with Director Miller. For example, Plaintiff testified that at least three times when she answered a telephone call from Miller, Miller asked if there was anyone she could talk to, rather than assuming that Plaintiff would be able to help her. Pl. Tr. 37-38. Plaintiff also testified that Miller made "unsettling comments," such as "Oh, you stack things up like I do," when referring to a stack of mail on Plaintiff's desk. Pl. Tr. 38. Plaintiff testified that Miller commented to her, "Do you know your job?" and "Get with the program," when Plaintiff had been in a new position for only three days. Pl. Tr. 41. Plaintiff testified that after September 2007, Miller began to write her up for errors on matters that Plaintiff had not been trained, and for errors for which other employees were not written up. Pl. Tr. 88-90, 97, 100-03, 125-26.

Plaintiff testified that Director Miller once asked her, in a "general conversation" concerning kids, whether Plaintiff was a grandmother. Pl. Tr. 56-57. Plaintiff also testified that Miller made comments to the effect of, "You're slower. Oh, you would be slower," which Plaintiff believed were made in reference to her age. Pl. Tr. 57. Plaintiff also testified that she believed that Miller "implied" that Plaintiff was too old to be transferred to a position as a financial counselor because Miller stated, "I thought about it, but no." Pl. Tr. 58. Finally, although Plaintiff could not provide any context for the statement, such as to whom, or about whom it was said, or the setting, Plaintiff

-6-

testified that Miller once stated, "You're older," and would note if someone was "young." Pl. Tr. 62-63. Plaintiff testified that a twenty-three year old transferred to the financial counseling department in December 2006, but Plaintiff acknowledged that she had not been seeking a financial counselor position at that time. Pl. Tr. 58-61.

Also in support of her age discrimination claim, Plaintiff cites an excerpt from the following passage of VP Smith's deposition testimony provided in *O'Leary v. Accretive Health, Inc.*, No. 09-CV-1428 (N.D. Ill. filed Mar. 6, 2009)[1]:

Q: Let me show you what's been marked Exhibit 5. Read that to yourself and tell me if it refreshes your memory as to whether Judith Holmes reported to you concerns that Rhonda was repeatedly referring to her as old.

A: I remember this exactly. I will tell you we talked about this a lot in the company, that it's very important that employees embrace the Accretive model and not their old ways – the old way of doing things. It has nothing to do with the age of the person. Okay. We have a lot of issues often with incumbent people from the industry that cling to the old ways. We say that a lot. That's not referring to an old person.

Q: Judith wasn't an incumbent person in the industry, was she? She was somebody that you and Travis had brought in independent, correct?

A: I'm talking about a person – we hire– Let me clarify. Okay. We hire a couple different kinds of people. We hire people with extensive patient accounting background and we hire a lot of people without any at all. Okay. And we find that those that we hire with the specific background, some cling to old ways of doing things; and I use that word on purpose because we use it all the time. Others change the way we want them to operate with our new model, and that's exactly what we're talking about. That's what this says here. I don't see anything in here that talks about Judith being an old person, at least not that I read.

Q: So it's your testimony that Judith [Holmes] never raised any concerns that she had about Rhonda referring to Judith personally as an "old patient accounting director"?

A: That means a person from the old school of doing things, I can tell you.

Q: Maybe you can answer my question, Mr. Smith. Is it your testimony that Judith never told you that she had concerns that Rhonda was referring to her, meaning Judith, as an "old patient accounting director"?

---

[1] Apparently Joseph O'Leary was an African-American man employed by Accretive Health as a senior executive.

A: She did say that, but not in the context of being an old person.

Q: So Judith did tell you that she had concerns about how Rhonda was constantly referring to Judith as old?

A: But I object to your context.  That's not the context.

Q: Judith did tell you that?

A: In these words, yes.

Q: And did you go and report that Judith was complaining about how Rhonda was repeatedly referring to her age and that she was old?

A: No, because that's not what she was doing.

Q: So you did not interpret that as a potential age discrimination claim?

A: No, I did not.

Q: Are you aware that Accretive Health System has been sued for an age discrimination claim by Clara Pinkston?

A: Yes, I am.

Q: And it never crossed your mind that Accretive might be subject to a potential age discrimination claim because Judith told you that Rhonda was constantly referring to Judith as old?

A: No, because that's not the right context.

[Objection]

Q: Were you there when Rhonda was making the actual comments to Judith Holmes about Judith's age?

A: I've heard this comment, yes, with me there.

Q: So you –

A. I've had a similar conversation myself with the employees about the old ways of doing things all the time.

Q: Were you there when Rhonda referred to – Were you physically present –

A: I remember once.

Q: Okay.  When did that occur?

A: Sometime in the fall of '06.  I can't do any better than that.

Q: In Smith Exhibit 5 when Judith writes the note on November 1, 2006, were you there –

A: This one?

Q: Yes.  Were you there at the time that Rhonda made the comment; particularly, it says,

Today in front of Shannon, she said, that the Accretive way, not the way of an old patient accounting director; and then Judith continues. Were you there for that conversation?

A: I don't know. I was there – I heard that once when I was - -

[Objection]

Smith Tr. (O'Leary) 126-29, (Oct. 30, 2009) (Def. Reply Br. Ex. 1).

Plaintiff testified that it was her belief that Director Miller frequently refused to approve "charity requests" for black male patients. *See generally* Pl. Tr. 36-65. Also, in support of her race discrimination claim, Plaintiff cites an excerpt from the following passage of VP Smith's deposition testimony provided in *O'Leary*:

Q: And you observed how Rhonda Miller was treating employees when you were in charge of her?

A. I did and I didn't stand for it and I dealt with it.

Q: How did you deal with it?

A: By a very direct conversation that she better not do that or she'll be gone.

Q: And what specifically did you observe Rhonda Miller do that you didn't stand for?

A: Berating employees in front of other employees was probably the worst thing, and demeaning – demeaning language and – that was the main thing – in public – in a public forum.

Q: And which employees did she berate or treat --

A: She's pretty indiscriminate. Anybody.

Q: What are the names of the employees that she demeaned or berated?

A: Many.

Q: You don't recall any names?

A: Well, many names. Well, I heard about Seline [Nichols], Judith [Holmes]. You're testing me on names from three years ago, so . . .

Q: How about Kathy White?

A: o. I didn't see it with Kathy, no.

Q: How about Clara Pinkston?

A: No, not with Clara either.

Q: Any --

A: If you're asking me was it with different race and ethnicity groups, yes, it was.

Q: And you were aware that Kathy White was terminated?

A: Yes, I was.

Q: And you were aware that Clara Pinkston was terminated?

A: Clara was one of the group that was laid off at the – the last five or six people at the end.

Q: She was told her employment was ended, correct?

A: Well, she was not fired for cause though.  There were four other people at the time that were not African-American.

Smith Tr. (O'Leary) 103-04.  Smith further testified:

Q: Weren't you concerned about the potential exposure to Accretive Health of hostile work environment claims based on the way Rhonda Miller was treating the African-American employees?

A: It was not just African-American employees.

Q: So you had no concern about any --

A: It was not racial that I ever saw.

Q: You had no concern about any race discrimination or hostile work environment claims?

A: Let's separate this.  I never had any concerns about it being a racial issue discrimination or age discrimination.  I did have concern over the way she treated employees.

Q: You're aware that Accretive Health has been sued twice by two former employees claiming that Rhonda Miller discriminated against them on account of their race?

A: I'm aware of that, yes.

Q: And it still never crossed your mind that there might be potential claims as a result of how Rhonda was treating employees?

A: That's why I insisted that she change.

Q: So you insisted that she change so that Accretive Health would not be subjected to these types of claims, right?

A: It's not a good way to manage.  Forget the claims.

Q: So you weren't concerned about any claims?

A: Of course I was concerned about claims.  I'm also concerned about good management.

Smith Tr. (O'Leary) 114-116.

II

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary

judgment must designate specific facts in affidavits, depositions, or other factual material showing

"evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The party who bears the burden of proof must present a jury question as to each element of the

claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical

doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564

(6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)).  Failure to prove an essential element of a claim renders all other facts immaterial for

summary judgment purposes.  *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895

(6th Cir. 1991).

III

The Michigan ELCRA provides that an employer shall not:

> Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual
> with respect to employment, compensation, or a term, condition, or privilege of employment,
> because of religion, race, color, national origin, age, sex, height, weight, or marital status.

Mich. Comp. Laws § 37.2202(1)(a).  A plaintiff can establish a claim of unlawful discrimination

under the ELCRA either by producing direct evidence of discrimination or by presenting a prima

facie case of discrimination in accordance with the burden-shifting framework established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *Town v. Mich. Bell Tel. Co.*, 568

N.W.2d 64, 67-68 (Mich. 1997); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-21 (Mich. 2001).

In this case, it is undisputed that Plaintiff has not advanced direct evidence of discrimination and the

analysis will proceed under the *McDonnell Douglas* framework.

First, to establish a prima facie case under *McDonnell Douglas*, a plaintiff must demonstrate

that:

-12-

(1) she was a member of the protected class; (2) she suffered an adverse employment action . . . ; (3) she was qualified for the position; but (4) she was discharged under circumstances that give rise to an inference of unlawful discrimination.

*Lytle v. Malady*, 579 N.W.2d 906, 914 (Mich. 1998) (footnote omitted).  In at least some age discrimination cases, the fourth element of a prima facie case can be established with evidence that the plaintiff "was replaced by a younger person."  *Id.* at 916.  It can also be established with evidence that the defendant treated the plaintiff differently than persons of a different age class who engaged in the same or similar conduct.  *Town*, 568 N.W.2d at 68.

Second, a presumption of unlawful discrimination arises from establishment of the prima facie case, and the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action.  *Lytle*, 579 N.W.2d at 915.  If the defendant articulates a reason, the burden of proof returns to the plaintiff.  *Id.*

Third, and finally, "[a] plaintiff ha[s] to show . . . that there [i]s a triable issue that the employer's proffered reasons were not true reasons, but were a mere pretext for discrimination." *Id.*  Plaintiff can establish pretext in three ways: (1) by showing that the reason had no basis in fact; (2) if the reason had a basis in fact, by showing that it was not the actual factor motivating the decision; or (3) if it was a factor, by showing that it was insufficient to justify the decision.  *Feick v. Monroe County*, 582 N.W.2d 207, 212 (Mich. Ct. App. 1998) (internal citation omitted).

Defendant advances three main arguments in its motion for summary judgment.  First, Defendant asserts that Plaintiff cannot establish the fourth element of a prima facie case, that Plaintiff "was discharged under circumstances that give rise to an inference of unlawful discrimination."  *Lytle*, 579 N.W.2d at 914.  Second, Defendant contends that Plaintiff cannot establish that Defendant's proffered reasons for termination of Plaintiff's employment were a pretext

-13-

for unlawful discrimination.  Third, and finally, Defendant argues that Plaintiff cannot establish the modified prima facie case that applies to claims involving work force reductions.

### A

Defendant asserts that Plaintiff cannot establish the fourth element of a prima facie case, that Plaintiff "was discharged under circumstances that give rise to an inference of unlawful discrimination."  *Lytle*, 579 N.W.2d at 914.  As a threshold issue, Defendant cites an unpublished per curiam opinion from the Michigan Court of Appeals, *Parhar v. Dart Container Corp.*, No. 258471, 2006 WL 664165 (Mich. Ct. App. Mar. 16, 2006), to support the proposition that Plaintiff cannot attempt to establish the fourth element of an age or race discrimination claim solely through evidence that she was replaced by a younger, Caucasian person.  Defendant emphasizes that, in a footnote in *Hazle*, the Michigan Supreme Court stated as follows:

> Largely because the issue was undisputed, we assumed in *Lytle*, 579 N.W.2d 906, that the plaintiff established a prima facie case under *McDonnell Douglas* by presenting evidence that "she was replaced by a younger person."  We caution the bench and bar not to rely on *Lytle* for the proposition that a prima facie case of unlawful discrimination can be established merely by providing evidence that a qualified minority candidate was rejected in favor of a qualified nonminority candidate.  As opposed to this case, *Lytle* did not involve a choice between two qualified candidates for an open position.

628 N.W.2d at 525 n.14.  Significantly, however, Defendant does not explain why *Hazle*'s cautionary footnote is applicable to this case when, like *Lytle*, this case does not "involve a choice between two qualified candidates for an open position."

Nonetheless, it is not necessary to determine the reach of *Hazle*'s caution, as Defendant's argument that Plaintiff was not in fact "replaced" is persuasive.  Defendant explains that Plaintiff was not "replaced" because "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other

existing employees already performing related work." *Lytle*, 579 N.W.2d at 917 n.27.  Defendant emphasizes that Plaintiff was employed in the patient accounting department performing customer service work and admitted that she never worked as a financial counselor, even though some of her duties overlapped with that position.  Defendant emphasizes that Ms. Robinson was employed as a financial counselor both before and after Plaintiff's discharge, and at best, Plaintiff can demonstrate that Ms. Robinson assumed some duties previously performed by Plaintiff while continuing to perform her duties as a financial counselor.  Defendant emphasizes that all patient accounting positions were eliminated and moved to Detroit.

Defendant also contends that Plaintiff's testimony regarding Ms. Robinson's statement to Plaintiff, "I'm doing your job," is inadmissable hearsay pursuant to Federal Rule of Evidence 802. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment.") (internal citation omitted). Plaintiff is offering the statement to prove, Defendant explains, that Ms. Robinson was in fact performing Plaintiff's job and therefore qualifies as hearsay pursuant to Federal Rule of Evidence 801.  *See* Fed. R. Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Defendant also asserts that the statement does not qualify as a non-hearsay admission of a party-opponent under Federal Rule of Evidence 801(d)(2) because an admission on behalf of an entity can only be made by an authorized person.  Rule 801(d)(2) provides that a statement is non-hearsay when the following conditions are met:

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant

concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Defendant contends that Plaintiff has not advanced any evidence that Ms. Robinson was authorized by Defendant to make a statement regarding her position; Ms. Robinson was employed by St. Mary's, not Defendant; and the statement did not concern a manner within the scope of Ms. Robinson's employment.

In response, Plaintiff contends that Ms. Robinson's statement is an admission of a party-opponent. To begin, Plaintiff criticizes Defendant's reliance on *Jacklyn*, 176 F.3d 921. In *Jacklyn*, the Sixth Circuit Court of Appeals explained:

> There is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf of your employer. The test is whether the statement concerns a matter within the scope of the agency or employment. *Cf. Moore v. KUKA Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999) (out-of-court declarant's statement is not hearsay under 801(d)(2)(D) where he was considered and used as an agent of the defendant to convey a message to the witness).

*Jacklyn*, 176 F.3d at 928. Somewhat inexplicably, Plaintiff contends that the Court should look instead to *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 867 (S.D. Ohio 2005), in which the court "presume[d] that statements concerning payment of employees are matters within the scope of [the manager's] agency or employment relationship, and matters about which she, as a manager, would have personal knowledge." The manager had made a statement that the employer "frequently manually reduced the number of hours that employees reported working." *Id.*

While Plaintiff emphasizes that Ms. Robinson clearly has personal knowledge about the job duties that Ms. Robinson was performing, it is significant that Ms. Robinson's statement also concerned what Plaintiff's former job duties had been. Plaintiff has not provided any support for the proposition that statements concerning the job duties of a former employee should be considered

-16-

to be within the scope of a non-manager coworker's employment. Additionally, Plaintiff does not address the agency issue raised by the fact that Ms. Robinson was not employed by Defendant, but St. Mary's, or explain how the statement was made by Ms. Robinson in a "representative capacity" as to Defendant. Thus, Ms. Robinson's statement is properly excluded as hearsay.

Based on the above, Defendant is entitled to summary judgment on Plaintiff's age and race discrimination claims under the ELCRA. On the evidence advanced, Plaintiff cannot establish that she was replaced by a younger individual or an individual of another race, nor has she advanced other evidence to satisfy the fourth element of a prima facie case. While Plaintiff contends that she has advanced evidence that supports an inference of unlawful discrimination in the form of conflicting testimony between VP Smith and Director Miller as to who made the decision to discharge employees and how the decisions were made, a review of the deposition testimony, as accurately cited in the above summary of the facts, reveals that the conflicts identified by Plaintiff do not exist.

## B

Defendant contends that Plaintiff cannot establish, at the third step of the *McDonnell Douglas* analysis, that Defendant's proffered reasons for termination of Plaintiff's employment were a pretext for unlawful discrimination. To reiterate, Plaintiff can establish pretext in three ways: (1) by showing that the reason had no basis in fact; (2) if the reason had a basis in fact, by showing that it was not the actual factor motivating the decision; or (3) if it was a factor, by showing that it was insufficient to justify the decision. *Feick*, 582 N.W.2d at 212. Additionally, Defendant emphasizes that "disproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was

-17-

a motivating factor underlying the employer's adverse action," quoting *Lytle*, 579 N.W.2d at 916.

Defendant contends that the first and third ways of establishing pretext are not applicable to this case because its offered reason for Plaintiff's discharge, the closing of patient accounting, had both a "basis in fact" and was sufficient to justify the decision. Notably, Plaintiff's response does not address the issue of pretext in a detailed manner. Plaintiff acknowledges that pretext can be established in three ways and then simply states:

> As already explained in the preceding discussion, not only has the Plaintiff submitted evidence that she was replaced by a younger Caucasian, the Plaintiff has also submitted additional evidence that further establishes, at a minimum, a question of fact as to whether the reason given was pretextual to unlawful discrimination on the base of age and race.

Pl. Br. 15-16.

Given the evidence advanced, the proposition that the first and third ways of establishing pretext are simply not applicable in this case. Thus, Plaintiff must demonstrate that the closing of patient accounting "was not the actual factor motivating the decision" to discharge Plaintiff. As to this theory, Defendant contends that there is insufficient evidence to show that the closing of patient accounting was not the actual reason because Plaintiff was one of five employees discharged in the fall of 2007 on the same basis, and, at best, Plaintiff can establish that another employee took over some of the duties that she had assumed as the result of the discharge of other employees.

Defendant further asserts that the evidence advanced by Plaintiff, i.e., comments ascribed to Director Miller by Plaintiff and VP Smith, as outlined in the statement of facts above, which Plaintiff asserts demonstrates age and race discrimination, are, at best, "stray remarks" which are not probative of unlawful discrimination. Defendant contends that the following factors are determinative of whether a comment is a "stray remark":

(1) Were the disputed remarks made by the decisionmaker or by an agent of the employer

-18-

> uninvolved in the challenged decision?  (2) Were the disputed remarks isolated or part of a pattern of biased comments?  (3) Were the disputed remarks made close in time or remote from the challenged decision?   (4) Were the disputed remarks ambiguous or clearly reflective of discriminatory bias?

*Krohn v. Sedgwick James of Mich. Inc.*, 624 N.W.2d 212, 214 (Mich. Ct. App. 2001).  Plaintiff's response does not address whether the comments ascribed to Miller are "stray remarks."

Director Miller's comments are stray remarks not probative of either race or age discrimination primarily because Miller's alleged comments are ambiguous as to whether they have anything do with age or race rather than Miller's general attitude toward all the employees that she managed.  Additionally, the evidence does not suggest that any comments directed at Plaintiff were made close in time to Plaintiff's discharge.  Indeed, it may be significant that, despite Plaintiff and Miller's apparent interpersonal conflict, Plaintiff was one of the last two employees in patient accounting to quit, transfer to another position, or be laid off or fired.  Moreover, despite Plaintiff's attempts to characterize Miller as a "decisionmaker," none of the evidence advanced suggests that Miller had any discretion regarding the termination of Plaintiff's employment when Plaintiff has not disputed that St. Mary's gave Defendant a directive to eliminate the remaining positions and Plaintiff did not apply for any open positions.  Thus, even if Plaintiff could establish a prima facie case of age or race discrimination, Defendant is entitled to summary judgment because Plaintiff cannot establish pretext.

C

Defendant also argues that Plaintiff cannot establish the modified prima facie case that applies to cases involving reductions in force, relying primarily on *Matras v. Amoco Oil Co.*, 385 N.W.2d 586 (Mich. 1986).  There, the Michigan Supreme Court explained that the general *McDonnell Douglas* formulation is "incomplete in the workforce-reduction situation" and that

-19-

"[e]vidence that a competent older employee was terminated, and a younger employee was retained, is insufficient standing alone to establish a prima facie case when the employer reduces his workforce because of economic necessity." *Matras*, 385 N.W.2d at 590. Therefore, "when an employer lays off employees for economic reasons, the courts have required the employee to present sufficient evidence on the ultimate question – whether age was a determining factor in the decision to discharge the older protected employee." *Id.* (footnote omitted).

Plaintiff's response did not address application of the modified standard. Nonetheless, for the same reasons that Plaintiff cannot establish the fourth element of the standard prima facie case or pretext discussed above, Plaintiff cannot succeed under the work force reduction standard. Thus, Defendant is entitled to summary judgment regardless of which standard is applied.

IV

As previously noted, Plaintiff has recently filed a "motion" [Dkt. # 23] to supplement her response to Defendant's motion for summary judgment with material that she believes "supports a pattern of age and race discrimination by Defendants against similar employees." Without further explanation, Plaintiff seeks to admit the following documents: (1) the plaintiff's brief in response to the defendant's motion for summary judgment in *O'Leary v. Accretive Health, Inc.*, No. 09-CV-1428 (N.D. Ill. Pl. Resp. filed Dec. 28, 2009); (2) a December 21, 2009, declaration of Judith Holmes; (3) a November 1, 2006, email message from Ms. Holmes to an unknown recipient; (4) a February 27, 2007, handwritten note presumably authored by Ms. Holmes; (5) a March 12, 2007, handwritten note authored by Ms. Holmes; (6) a November 28, 2006, email from O'Leary to Ms. Holmes; and (7) a December 28, 2009, declaration by Seline Nichols.

In response [Dkt. # 24], Defendant contends that Plaintiff should not be granted leave to

-20-

supplement her response for three main reasons. First, Defendant emphasizes that Plaintiff's request has been made over thirty days after Plaintiff's response was due under the local rules. Second, Defendant contends that Plaintiff has not advanced any justification for the timing of her request. Defendant emphasizes that both Ms. Holmes and Ms. Nichols were known to Plaintiff well in advance of Defendant's filing of its motion for summary judgment – Ms. Holmes appeared on Plaintiff's April 20, 2009, initial disclosures and Ms. Nichols appeared on Plaintiff's September 14, 2009, amended disclosures. Thus, Plaintiff had ample time to secure affidavits from those witnesses.

Third, Defendant emphasizes that the materials that Plaintiff seeks to introduce are not admissible. With respect to the brief filed in *O'Leary*, Defendant emphasizes that Plaintiff has provided no explanation as to why the brief, which contains arguments, not findings of fact, related to O'Leary's claims, is relevant to this case. Defendant emphasizes that the underlying evidence referred to in the brief is not offered by Plaintiff and that the brief is essentially hearsay. Defendant also contends that many of the statements made in the declarations of Ms. Holmes and Ms. Nichols are inadmissible hearsay.

While Plaintiff has not explained how the materials she wishes to supplement her response with are material to her claims, it is significant that the documents authored by or related to Ms. Holmes' employment are consistent with VP Smith's deposition testimony that Ms. Holmes complained that Miller criticized Ms. Holmes for her "old ways." Thus, the materials are largely duplicative of the evidence already advanced by Plaintiff and do not appear to be material to the analysis in this opinion. Based on this fact and the arguments advanced by Defendant, Plaintiff's motion to supplement her response will be denied and the materials stricken from the record.

V

Finally, Defendant has filed a motion in limine to exclude the expert report and testimony of Plaintiff's expert, Dr. Frank P. Stafford, from trial.  Generally, Defendant contends that Dr. Stafford's testimony and report do not meet the reliability requirements of Federal Rule of Evidence 702 and *Daubert*, and that the report fails to conform to the requirements of Federal Rule of Civil Procedure 26(a)(2)(B).  Defendants contends that Dr. Stafford is an economist who is not qualified to provide an expert opinion as a vocational expert, that his report is based on inaccurate data and makes assumptions that have no basis in fact, and that he has not provided the reasons or basis for his opinions.  Plaintiff responds that Dr. Stafford's methodology is an accepted methodology among economists and that Defendant's failure to submit expert testimony challenging the methodology is fatal to Defendant's motion.  Based on the fact that Defendant is entitled to summary judgment on Plaintiff's claims, this motion will be denied as moot.

VI

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 15] is **GRANTED** and that Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff's motion to supplement response [Dkt. # 23] is **DENIED** and the exhibits [Dkt. # 23-2, 23-3, 23-4] are **STRICKEN** from the record.

It is further **ORDERED** that Defendant's motion in limine [Dkt. # 14] is **DENIED AS MOOT**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 15, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 15, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS